**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| NATIONAL CAPITAL PRESBYTERY *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>ALEJANDRO N. MAYORKAS *et al.*,<br><br>*Defendants.*[1] | Civil Action No. 18-2681 (TJK) |

**MEMORANDUM OPINION**

Plaintiffs challenge Defendants' denial of National Capital Presbytery's petition to renew the nonimmigrant religious worker visa for one of its congregation's ministers. They argue the denial violated the Religious Freedom Restoration Act and the Administrative Procedure Act. They also seek a writ of mandamus. Before the Court are the parties' cross-motions for summary judgment. For the reasons explained below, the Court will grant both motions in part and deny them in part and remand the matter to the agency for further proceedings.

I.    **Background**

    A.    **Statutory and Regulatory Background**

"The Immigration and Nationality Act allows ministers and other religious workers to enter and stay in the United States under a non-immigrant visa, known as an R-1 visa, for up to five years." *Iglesia Pentecostal Casa de Dios Para Las Naciones, Inc. v. Duke*, 718 F. App'x 646, 648 (10th Cir. 2017); *see also* 8 U.S.C. § 1101(a)(15)(R), (27)(C)(ii); 8 C.F.R. §§ 204.5(m), 214.2(r). "To obtain the visa, a religious organization seeking to hire and sponsor an R-1

---

[1] Defendant Alejandro Mayorkas, who assumed office as Secretary of the Department of Homeland Security in February 2021, is automatically substituted for Kirstjen Nielsen under Federal Rule of Civil Procedure 25(d).

applicant petitions the United States Citizenship and Immigration Services ("USCIS")." *Iglesia Pentecostal*, 718 F. App'x at 648. "The petitioner must: (1) establish that the R-1 applicant has been a member of the same denomination as the petitioner for at least two years preceding the petition . . . and (2) demonstrate its intention and ability to compensate the R-1 applicant." *Id.*

A petitioner can show how it intends to compensate an R-1 applicant by submitting several types of documents to USCIS. *See* 8 C.F.R. § 214.2(r)(11). The petitioner must "state how the petitioner intends to compensate the alien, including specific monetary or in-kind compensation, or whether the alien intends to be self-supporting. In either case, the petitioner must submit verifiable evidence explaining how the petitioner will compensate the alien." *Id.* Evidence of compensation "may include past evidence of compensation for similar positions; budgets showing monies set aside for salaries, leases, etc.; verifiable documentation that room and board will be provided; or other evidence acceptable to USCIS." *Id.* § 214(r)(11)(i). If the petitioner can submit IRS documents "such as IRS Form W-2 or certified tax returns," it must do so. *Id.* If not, "the petitioner must submit an explanation for the absence of IRS documentation, along with comparable, verifiable documentation." *Id.* The petitioner "must prove by a preponderance of evidence that he or she is eligible for the benefit sought." *Matter of Chawathe*, 25 I & N. Dec. 369, 375 (2010).

### B. Procedural Background

Presbyterian Church USA is the largest Presbyterian denomination in the United States. ECF No. 23-1 ¶ 1. The Church is divided into many regional presbyteries, which are subdivided into local congregations. *Id.* The Church, regional presbyteries, and local congregations are all distinct legal entities, but they act as "one ecclesiastical body." *Id.* National Capital Presbytery ("NCP") is a regional presbytery and Mizo Presbyterian Church ("Mizo") is a local congregation within NCP's geographic bounds. ECF No. 1-4 at 2. Both are chartered entities under the

Presbyterian Church.  ECF No. 23-1 ¶¶ 2, 4.  The Church's governing document is the Book of Order.  *Id.* ¶ 3.  Section G-2.0505 of the Book allows presbyteries, including NCP, to "recognize the ordination and receive as a member of presbytery a new immigrant minister" for "immigrant fellowships and congregations."  *Id.*

In 2014, NCP filed an I-129 petition for an R-1 visa for Reverend Lal Engzau, an ordained Presbyterian minister and citizen of Myanmar.  *Id.* ¶ 5  NCP represented that it would offer Rev. Engzau $43,041 in annual compensation: "$16,786 for wages; $14,868 for housing; $3,684 for utilities; $2,703 for 'Self Employment Contribution Act'; and $5,000 for medical insurance."  ECF No. 19-2 ¶ 21.  In 2015, USCIS approved the petition, ECF No. 23-1 ¶ 5, and in April of that year, Rev. Engzau and his wife were admitted to the United States.  ECF No. 1-2 at 5.

In July 2017, NCP petitioned to renew Rev. Engzau's visa.[2]  ECF No. 19-2 ¶ 1.  In its petition, NCP represented that it would offer the following compensation package to Rev. Engzau: "$33,000 for wages; $3,000 for 'Self Employment Contribution Act'; and $14,000 for medical insurance."  ECF No. 19-2 ¶ 2.  This reconfiguration of Rev. Engzau's compensation package reflected NCP's decision in 2016 to structure his compensation to "combine salary, housing and utility payments in to a salary."  ECF No. 1-2 at 5.  NCP also attested that it was "willing and able to provide salaried or non-salaried compensation to [Rev. Engzau]," ECF No. 19-2 ¶ 3, and certified that it was the "Employing Organization," *id.* ¶ 4.

NCP submitted several documents with its petition.  The documents included Rev. Engzau's employment contract, Mizo church's budget, checks from Rev. Engzau's personal

---

[2] NCP also filed an I-539 petition for Rev. Engzau's wife, to renew her R-2 Visa for Family of Religious Workers.  ECF No. 23-1 ¶ 10.  Her petition, in the end, is tied to Rev. Engzau's R-1 status.  *Id.*

checking account to a utility company, and proof that Mizo had made out three checks to Rev. Engzau in June 2017—two for $1,375 for the pay periods of that month, and a third check for $105.47 with "TA" written in the memo line.  *Id.* ¶¶ 6–8, 11.  The documents also included a housing contract showing that Rev. Engzau and his wife were tenants under a lease signed by Mizo, and that Mizo was responsible for lease payments of $11,358, $7,400, and $14,500 in 2015, 2016, and 2017, respectively.  *Id.* ¶ 9–10.

NCP also provided various tax documents.  *Id.* ¶ 12.  Rev. Engzau's 2015 W-2 reflected Mizo paid him a salary of $12,979 and provided housing worth $12,979.  *Id.* ¶ 13.  His 2015 Form 1040 also showed he received a salary of $12,979.  *Id.* ¶ 14.  His 2016 W-2 stated that he received a salary and housing from Mizo, both worth $16,000.  *Id.* ¶ 15.  And his 2016 Form 1040 likewise reflected a salary of $16,000.  *Id.* ¶ 16.  None of the petition documents reported any health insurance or utility payment compensation to Rev. Engzau.  *Id.* ¶¶ 17–18.

In September 2017, USCIS issued a request for evidence ("RFE") pertaining to, among other things, Rev. Engzau's compensation.  *Id.* ¶¶ 22–23.  USCIS raised two compensation-related issues.  *Id.* ¶¶ 24–25.  First, USCIS noted that the documents NCP submitted revealed that Mizo—not NCP—compensated Rev. Engzau in violation of the requirement "that the petitioner compensate the beneficiary, not a third-party organization."  ECF Nos. 1-5 at 4; 19-2 ¶ 24; 23-1 ¶ 7.  Second, USCIS stated that "even if third-party compensation were permissible, no evidence of medical insurance was found, and the wage and tax statement reflects that Mizo [] provided a salary less than $16,786."  ECF No. 1-5 at 4.

NCP responded to USCIS by submitting a letter from Reverend Karen Chamis.  ECF No. 19-2. ¶ 26.  Rev. Chamis explained that "based on [the Presbyterian Church's] connectional theology [] [NCP] petitioned for Rev. Lal Engzau to serve at the Mizo church."  *Id.* ¶ 27.  Rev.

4

Chamis submitted additional documents to USCIS, including:  (1) a portion of a residential dwelling lease listing Rev. Engzau and his wife as tenants and showing rent of $1,450 per month for May 2015 through April 2016; (2) an addendum to the residential lease dated April 2016 extending its terms through May 2017; (3) a 2016 IRS Form 1095-A (Health Insurance Marketplace Statement) reflecting health insurance coverage for Rev. Engzau and his wife, and reflecting annual total costs of about $6,000; and (4) dental insurance cards for both of them and a dental health plan application summary.  *Id.* ¶ 28.  NCP also submitted a bank account statement showing more than sufficient funds to pay Rev. Engzau's salary going forward.  ECF No. 23-1 ¶ 8.

In January 2018, the Director of the USCIS California Service Center denied NCP's renewal petition.  ECF No. 19-2 ¶ 31.  The Director concluded the record did not credibly establish that NCP intended to provide Rev. Engzau the petition's proposed compensation for two reasons.  *Id.*  First, NCP had not shown it, as the petitioner, intended to compensate Rev. Engzau because it did not "control[] the funds of [Mizo] or can otherwise legally require that [Mizo] provide any particular amount or form of compensation to the beneficiary."  ECF No. 1-1 at 4–5.  Second, the Director found that NCP had not shown that it could pay Rev. Engzau the stated compensation because "[e]ven if [Mizo] acts on [NCP's] behalf, the fact that [NCP], through [Mizo], did not provide the beneficiary a salary of $16,786 in 2016 in accordance with the terms of the prior petition casts doubt on [NCP's] intention to provide the beneficiary a salary of $33,000 in accordance with the terms of the instant position."  *Id.* at 5.  The Director added that NCP's other evidence did not "acknowledge or address the [intended compensation] inconsistency," *id.*, nor establish, by preponderance of the evidence, that NCP "intend[ed] to provide the beneficiary the proposed compensation."  *Id.*

NCP appealed the denial to the USCIS Administrative Appeals Office ("AAO").  ECF No. 19-2 ¶ 38.  NCP acknowledged the "inconsistent reporting of the compensation package" between the initial Form I-129 petition and the renewal petition.  *Id.* ¶ 41.  But it explained it had "changed its compensation guidelines in between the two filings which created some appearance that the compensation packages were very different and that Reverend Engzau was not getting paid what the church said it would pay him."  *Id.*  Though its original proposed compensation package to Rev. Engzau included separate line items for his wages, housing, and utilities, NCP changed the compensation structure in 2016 to combine his wages, housing, and utilities into one salary payment, rather than breaking out housing and utilities as separate line items.  *Id.* ¶ 42.  NCP also explained that its decision to petition for Rev. Engzau's visa rather than Mizo was a "matter of ecclesiastical governance and therefore religious exercise."  *Id.* ¶ 45.  And NCP requested an exemption from USCIS's requirement that Mizo, rather than NCP, act as the petitioner because that requirement substantially burdened its exercise of religion under the Religious Freedom Restoration Act ("RFRA").  *Id.* ¶¶ 45–47.

On appeal, the AAO affirmed the Director's determination that NCP failed to establish its intent to provide the proposed compensation to Rev. Engzau.  *Id.* ¶ 52.  In conducting its review, the AAO considered the 2015 and 2016 W-2s and 1040s; the 2016 1095-A; Mizo's May 2015 to October 2017 lease listing Rev. Engzau and his wife as occupants and reflecting monthly rent of $1,450 per month; Rev. Engzau's electricity bill payments; and the dental insurance cards and February 2017 health insurance plan summary.  ECF No.1-2 at 4–5.

The AAO found that NCP had established it paid Rev. Engzau's 2015 salary and housing costs.  *Id.* at 5.  However, the AAO held there was no evidence NCP compensated him for his utilities or health insurance and that, according to its calculations, the total amount of

documented compensation was more than $4,000 less than the prorated offered compensation. *Id.* As to the 2016 compensation, the AAO found that Rev. Engzau received $32,000 in the form of salary and housing, but that there was no evidence NCP compensated him for his utility costs. *Id.* The AAO noted that the "Form 1095-A indicates that healthcare premiums exceeding the offered amount were paid" but "the record does not include evidence that these premiums were paid by the Petitioner or that the Beneficiary was reimbursed." *Id.* Accordingly, the AAO found that documented compensation to Rev. Engzau in 2016 was more than $11,000 less than offered. *Id.*

The AAO also considered NCP's representation that it had changed Rev. Engzau's compensation package to combine his salary, housing, and utilities into a $32,000 salary with $13,500 in medical insurance benefits. *Id.* The AAO found that the compensation restructuring did "not resolve the discrepancy between the actual compensation and [NCP's] attestation on the [2014] petition," *id.,* and that NCP "did not file an amended Form I-129 in 2016 to reflect these changes" to Rev. Engzau's compensation, *id.* at 5 n.1. Given that the renewal petition raised the offered compensation to "$33,000 in salary and $14,000 for medical insurance," the AAO held "the evidence of the Beneficiary's past compensation detailed above does not establish how the Petitioner intends to provide the increased compensation offered in the instant petition." *Id.* The AAO affirmed the Director's decision but noted it "need not address the issue of the source of the compensation." *Id.* at 5 n.2.

C.    **This Lawsuit**

NCP, Mizo, Rev. Engzau, and his wife ("Plaintiffs") sued in November 2018. ECF No. 1. Plaintiffs argue that the Secretary of the Department of Homeland Security, the Senior Official Performing the Duties of the Director of USCIS, USCIS, and the United States ("Defendants"), violated RFRA and the Administrative Procedure Act ("APA"), by denying Rev.

Engzau's renewal petition. *Id.* ¶¶ 40–47; 42 U.S.C. § 2000bb-1; 5 U.S.C. § 500 *et seq.* They

seek a declaratory judgment that Defendants' decision was in error, that Defendants must

approve the renewal petition, and that NCP may petition on behalf of nonimmigrant religious

workers, even if the minister will serve a local congregation like Mizo. *Id.* ¶¶ 48–51. Finally,

Plaintiffs request an order of mandamus directing Defendants to reverse their denial of NCP's

visa renewal petition for Rev. Engzau and approve it. *Id.* ¶¶ 52–53, at 16.

## II.    Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a). A fact is "material" if a dispute over it "might affect the outcome of the suit

under the governing law," and a dispute is "genuine" if "the evidence is such that a reasonable

jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986). To survive summary judgment, a plaintiff must "go beyond the pleadings and

by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file,

designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*,

477 U.S. 317, 324 (1986) (internal quotation omitted).

## III.   Analysis

### A.    RFRA

Plaintiffs argue that the Director's denial of NCP's renewal petition and the AAO's

affirmation of that decision violate RFRA. "In 1990, the Supreme Court held in *Employment*

*Division v. Smith*, 494 U.S. 872 (1990), that the Free Exercise Clause of the First Amendment to

the Constitution does not prohibit burdens on the exercise of religion imposed by neutral laws of

general applicability. In so doing, the Court declined to apply the compelling interest balancing

test set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963), which required that governments

demonstrate that laws substantially burdening religious exercise are supported by a compelling interest.  Congress, seeking to secure a wider berth for religious exercise, enacted RFRA, which aimed to reinstate the compelling interest test in place of the neutrality standard pronounced by the Court."  *Vill. Of Bensenville v. Fed. Aviation Admin.*, 457 F.3d 52, 59–60 (D.C. Cir. 2006) (cleaned up).

RFRA accomplishes this goal by "prohibit[ing] the federal government from 'substantially burden[ing]' a person's exercise of religion even if the burden results from a rule of general applicability unless the government can demonstrate that 'application of the burden to the person–(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling government interest.'"  *Kaemmerling v. Lappin*, 553 F.3d 669, 677 (D.C. Cir. 2008) (quoting 42 U.S.C § 2000bb-1(b)).  Whether a person's "religious exercise is substantially burdened" is a "legal conclusion."  *Id.* at 679.  Similarly, both the compelling interest and least-restrictive-means inquiries are questions of law.  *See United States v. Friday*, 525 F.3d 938, 949 (10th Cir. 2008) (collecting cases from several circuits).

### 1.      Standing to Challenge the Director's Determination

Defendants make a threshold challenge to Plaintiffs' standing to challenge the Director's finding that NCP violated the third-party payment prohibition and the intent to compensate requirement.  ECF No. 19-1 at 24–26.  A party invoking federal court jurisdiction must show they meet the "irreducible constitutional minimum" of Article III standing.  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  A plaintiff must show that she "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Id.*  And "a plaintiff must demonstrate standing for each claim he seeks to press and

for each form of relief that is sought." *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (citation omitted).

Plaintiffs lack standing to challenge the Director's decision.  That is so because the AAO's decision, which binds the parties and represents the agency's last word, superseded the Director's initial determination.[3]  Even if the Court found that the Director's decision was unlawful, such a finding would not affect the petition denial because the AAO independently found that denial was warranted.[4]  Thus, any injury Plaintiffs suffered from the petition denial is neither traceable to the Director's decision nor redressable by invalidating the decision.  This means Plaintiffs do not have Article III standing to challenge the Director's decision.  To the extent Plaintiffs request review of the decision to avoid future petition denials based on third-party compensation, their asserted injury is speculative and insufficient to support standing.  *See Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 409 (2013) (holding injury "must be *certainly impending* to constitute injury in fact" and "[a]llegations of *possible* future injury" are insufficient) (citation omitted).  For the same reasons, they also lack standing to obtain a declaratory judgment on the Director's third-party compensation holding.  *See C.F. Folks, Ltd. v. DC Jefferson Bldg., LLC*, 308 F. Supp. 3d 145, 150 (D.D.C. 2018) ("The Article III case-or-

---

[3] The AAO's decision is "binding on the parties."  USCIS, *Precedent and Non-Precedent Decisions of the Administrative Appeals Office (AAO)*, at 2 (Nov. 18, 2013) (explaining effect of AAO decisions).  And it is a final agency decision.  *See Herrera v. U.S. Citizenship & Immigr. Servs.*, 571 F.3d 881, 885 (9th Cir. 2009) ("[T]he AAO's decision was the agency's final decision."); *Shawal, Inc. v. Lynch*, No. 14-cv-1512 (RCL), 2015 WL 7761053, at *4 (D.D.C. Dec. 2, 2015) ("A decision by the AAO on appeal constitutes a final agency action.").

[4] "The AAO is independent of the field offices, and exercises *de novo* review of all issues of fact, law, policy, and discretion.  This means that, on appeal, the AAO looks at the record anew and its decision may address new issues that were not raised or resolved in the prior decision." USCIS, *AAO Practice Manual* § 3.4, available at https://www.uscis.gov/administrative-appeals/aao-practice-manual/chapter-3-appeals (last updated Aug. 27, 2021).

controversy requirement 'is no less strict when a party is seeking a declaratory judgment than for any other relief.'") (quoting *Fed. Express Corp. v. Air Line Pilots Ass'n*, 67 F.3d 961, 963 (D.C. Cir. 1995)).[5]

### 2.   The AAO Decision

Turning to the AAO decision, in determining whether the decision violated RFRA, the Court "first must determine if [Plaintiffs have shown] a substantial burden on [their] religious exercise." *Kaemmerling*, 553 F.3d at 677.  At summary judgment, a "person who brings a challenge under RFRA bears the initial burden of proving that (1) the Government's policy or action implicates her religious exercise, (2) the relevant religious exercise is grounded in a sincerely held religious belief, and (3) the policy or action substantially burdens that exercise." *Sabra ex rel. Baby M v. Pompeo*, 453 F. Supp. 3d 291, 326 (D.D.C. 2020) (citation omitted). "Religious exercise" includes "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." *Kaemmerling*, 553 F.3d at 677–78 (quoting 42 U.S.C. §§ 2000bb-2(4), 2000cc-5(7)).  The government puts a "substantial burden" on religious exercise when it creates "substantial pressure on an adherent to modify his behavior and to violate his beliefs," *id.* at 678 (quoting *Thomas v. Rev. Bd.*, 450 U.S. 707, 718 (1981)), by "condition[ing] receipt of an important benefit upon conduct proscribed by a religious faith, or [denying] such a benefit because of conduct mandated by religious belief." *Thomas*, 450 U.S. at 717–18.

---

[5] Defendants also argue that Plaintiffs' RFRA claim is barred by the language in the rule's summary preamble, which states that "[a]n organization or individual who believes that the RFRA may require specific relief form any provision of this regulation may assert such a claim at the time they petition for benefits under the regulation."  ECF No. 19-1 at 5 (quoting 73 Fed. Reg. 72,276, 72,283 (Nov. 26, 2008)).  But this language merely invites RFRA exemption requests at the time of petition, rather than requiring them.  *See Singh v. Carter*, 168 F. Supp. 3d 216, 226 (D.D.C. 2016) (declining to impose lower-proceeding exhaustion requirement because RFRA "provides no textual support for the [] position that the plaintiff is required to exhaust administrative remedies").

Plaintiffs assert that Defendants substantially burdened their religious exercise by effectively conditioning Rev. Engzau's visa renewal on NCP showing that it compensated Rev. Engzau exactly how it had said it would in its original visa petition, or at least without the changes it made to his compensation since then.  *See* ECF No. 20-1 at 25–27.  The Court agrees.

First, the government's action here implicates NCP's religious exercise by interfering with NCP's decision to employ Rev. Engzau as its minister and compensate him as it chooses. The Supreme Court's First Amendment jurisprudence is instructive to understand the rights secured by RFRA.  *See Roman Catholic Archbishop of Wash. v. Bowser*, No. 20-cv-3625 (TNM), 2021 WL 1146399, at *9–11 (D.D.C. Mar. 25, 2021) (considering Free Exercise cases in applying RFRA).  Of course, under the First Amendment, the government "shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."  U.S. Const. amend. I.

In that context, the Supreme Court has recognized a "ministerial exception," grounded in both the Free Exercise and Establishment Clauses, that precludes the government from interfering with a religious organization's selection of its ministers.  *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 188 (2012).  Such interference, the Court held, both unconstitutionally "depriv[es] the church of control over the selection of those who will personify its beliefs" and "to shape its own faith and mission through its appointments," as well as draws the government into "ecclesiastical decisions" that are solely the province of the religious organization.  *Id.* at 188–89.  And well before the Supreme Court recognized the ministerial exception, the D.C. Circuit held that it provided a church a "legitimate claim to autonomy" in its appointment of ministers.  *Minker v. Balt. Ann. Conf. of United Methodist Church*, 894 F.2d 1354, 1357 (D.C. Cir. 1990) (quoting *King's Garden Inc. v. F.C.C.*, 498 F.2d

51, 56 (D.C. Cir. 1974)).  To justify that autonomy, the court held, the church need not show that it relied on factors that "were independently ecclesiastical in nature, only that they were related to a pastoral appointment determination."  *Id.*  More specifically, the Circuit has also held that a minister's salary is "an internal matter of the religious institution affected."  *See Granfield v. Catholic Univ. of Am.*, 530 F.2d 1035, 1037, 1047 (D.C. Cir. 1976); *Minker*, 894 F.2d at 1357. That a church may justify a salary determination by financial reasons, rather than theological ones, is of no moment.  *See Granfield*, 530 F.2d at 1037 n.3; *Minker*, 894 F.2d at 1357 (citing *Granfield*, 530 F.2d at 1047).

Though neither the Supreme Court nor the D.C. Circuit has held that RFRA incorporates the ministerial exception, the Court has no doubt that RFRA protects the free exercise rights the exception secures.  To begin with, the Circuit has held that RFRA precluded a Title VII claim because "the Government's interest in eliminating employment discrimination is insufficient to overcome a religious institution's interest in being able to employ the ministers of its choice." *E.E.O.C. v. Catholic Univ. of Am.*, 83 F.3d 455, 467–69, 470 (D.C. Cir. 1996).  And though the ministerial exception is a doctrine distinct from the *Sherbert v. Verner* compelling interest test that RFRA restored, *see id.* at 461–63 (exception survived *Smith*'s rejection of the compelling interest test), RFRA "covers the same types of rights as those protected under the Free Exercise Clause of the First Amendment," *Tyndale House Publishers, Inc. v. Sebelius*, 904 F. Supp. 2d 106, 129 (D.D.C. 2012) (citation omitted).  Finally, RFRA offers the right to freely exercise religion even "*greater* protection" than the Free Exercise Clause itself.  *Kaemmerling*, 553 F.3d at 677 (emphasis added); *see also Holt v. Hobbs*, 574 U.S. 352, 357 (2015) ("Congress enacted

RFRA in order to provide greater protection for religious exercise than is available under the First Amendment.")[6]

Second, NCP's appointment of Rev. Engzau was grounded in NCP's sincerely held beliefs as a member of Presbyterian Church USA.[7]  The Church's Book of Order provides that its responsibilities include "commissioning, sending, and support of such mission personnel as will spread the good news of the grace of Jesus Christ to the world and foster the growth and

---

[6] Although the Supreme Court only recognized the ministerial exception relatively recently, *see Hosanna-Tabor*, 565 U.S. at 188, that is immaterial.  For starters, the D.C. Circuit has applied the exception for many years.  *See E.E.O.C.*, 83 F.3d at 461–463 (1996); *Minker*, 894 F.2d at 1356–58 (1990); *King's Garden*, 498 F.2d at 56, 59–60 (recognizing exception but rejecting application).  And the Supreme Court has rejected the premise that "RFRA merely restored [pre-*Smith*] decisions in ossified form and d[oes] not allow a plaintiff to raise a RFRA claim unless that plaintiff f[alls] within a category of plaintiffs one of whom had brought a free-exercise claim that this Court entertained in the years before *Smith*."  *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 715–16 (2014).  The Court also rejected the view that RFRA "restrict[s] the concept of the 'exercise of religion' to those practices specifically addressed in our pre-*Smith* decisions."  *Id.* at 714.  And RFRA "plainly contemplates that courts would recognize exceptions"—similar in effect to the ministerial exception—that would protect the free exercise of religion.  *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 434 (2006).  "That is how the law works."  *Id.*; *see also E.E.O.C.*, 83 F.3d at 467–68, 470 (RFRA protects "a religious institution's interest in being able to employ the ministers of its choice" by creating a "compelling interest defense"); *Hankins v. N.Y. Ann. Conf. of United Methodist Church*, 516 F. Supp. 2d 225, 237–38 (E.D.N.Y. 2007) ("[E]ven if the ministerial exception is not applicable in this manner, RFRA's strict scrutiny standard compels an identical result.").

[7] Though the Court finds that Plaintiffs have met RFRA's "sincerely held belief" requirement, under these circumstances, they could likely show that Defendants burdened their free exercise rights even without linking those rights to a sincerely held belief.  In *E.E.O.C.*, the D.C. Circuit held that the government's interest in applying Title VII was "insufficient to overcome a religious institution's interest in being able to employ the ministers of its choice" but did not identify the organization's sincerely held belief.  83 F.3d at 467–68.  Because RFRA's burden shifting framework requires a court to consider the government's compelling interest only after a plaintiff shows that the government has burdened its free exercise rights, *see Sabra*, 453 F. Supp. 3d at 326 (citation omitted), the Circuit's reasoning in *E.E.O.C.* strongly suggests that interference in a religious organization's governance is a per se burden on that organization's free exercise.

development of God's people."[8]   To that end, a presbytery serving immigrant communities may, "if it determines that its strategy for mission with that group requires it, recognize the ordination and receive as a member of presbytery a new immigrant minister who furnishes evidence of good standing in a denomination."  ECF No. 23-1 ¶ 3.  NCP filed the visa petition for Rev. Engzau in accordance with the Book of Order, so he could serve the Mizo congregation.  *Id.* ¶¶ 4–6; ECF No. 1-4 ¶ 2.

Third, Plaintiffs have shown that the AAO's decision substantially burdened NCP's religious exercise.  As noted, "[a] substantial burden exists where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs."  *Sample v. Lappin*, 424 F. Supp. 2d 187, 193 (D.D.C. 2016) (citation omitted); *see Thomas*, 450 U.S. at 717–18.  In Defendants' own words, the AAO denied the petition, thus denying NCP the ability to employ Rev. Engzau, at least in part "specifically [because] Plaintiffs failed to submit any evidence of having paid for Rev. Engzau's health care or utility costs as promised" which "called into question the church's ability to provide the offered compensation going forward."  ECF No. 19-1 at 31.  But the parties agree that NCP provided bank account evidence that it and Mizo had more than enough funds to pay Rev. Engzau a $32,000 salary for the next year, which would have included his utility costs. ECF No. 23-1 ¶ 8.  And as for proof of what they had paid Rev. Engzau in the past, Plaintiffs assert without contradiction that Mizo paid (and presumably would continue to pay) Rev. Engzau's health insurance premiums directly to its insurance companies, as it did for all its

---

[8] *See* ECF No. 20-1 at 11 n.3 (providing link to the Book of Order).

employees, ECF No. 24-1.[9]  (NCP *did* provide available documentation that Rev. Engzau

received health insurance benefits equaling $6,328 in 2016.  ECF No. 1-2 at 4.[10])  Moreover,

after Rev. Engzau arrived in the United States, NCP changed his compensation to include the

cost of his utility payments in an increased salary, an increase which *was* documented.  ECF No.

1-2 at 5.[11]  Thus, the AAO required NCP to provide specific evidence that did not—and *could*

*not*—exist because of how they chose to change the way it compensated Rev. Engzau.  In so

doing, the AAO effectively conditioned approval of NCP's petition on not having made these

changes.  And for that reason, its denial of the renewal petition "depriv[ed] the church of control

over the selection of [the minister] who will personify its beliefs," *Hosanna-Tabor*, 565 U.S. at

188, by, at least in part, requiring NCP to conform an "internal matter," *Granfield*, 530 F.2d at

1047—Rev. Engzau's compensation—to USCIS's requirements.  This was a substantial burden

on NCP's exercise of religion.  *See O Centro Espirita Beneficiente Uniao Do Vegetal v. Duke*,

---

[9] Nothing in RFRA limits a Court's review to the administrative record, and so the Court will
accept Plaintiffs' supplementary exhibits.  42 U.S.C. § 2000bb *et seq.*; *see also O Centro
Espirita Beneficiente Uniao do Vegetal v. Duke*, 286 F. Supp. 3d 1239, 1261–63, 1262 n.14
(D.N.M. 2017) (holding APA record rule does not apply to RFRA challenge to agency action);
*Sabra*, 453 F. Supp. 3d at 325–331 (considering extra-record declarations on RFRA claim);
*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 239 F. Supp. 3d 77, 88–90 (D.D.C.
2017) (same); *Navajo Nation v. U.S. Forest Serv.*, 2006 WL 8441145, at *12 (D. Ariz. Mar. 1,
2006) (describing bench trial held on RFRA challenge to agency action).

[10] Plaintiffs submitted evidence to the Court establishing that, in 2017 and 2018, Engzau and his
wife received health insurance benefits worth $11,418 and $19,824.  ECF Nos. 25-2; 25-3.

[11] Plaintiffs also argue that the AAO miscalculated the prorated compensation amount NCP
documented in 2015.  ECF No. 20-1 at 29.  They claim the documented wage compensation
shows an annual rate of payment of $36,663, meaning that they overcompensated Rev. Engzau
by about $5,000.  *Id.*  Plaintiffs imply that this amount, which is close to the proffered $6,387 in
utility payments and Self Employment Contribution Act allowance, went toward Rev. Engzau's
utility costs.  *Id.*  Defendants do not contest this point.

286 F. Supp. 3d 1239, 1264 (D.N.M. 2017) (denying visa based on compensation regulation likely substantially burdened church and visa beneficiary's sincere religious exercise).

Defendants argue that the reasoning of an unpublished Tenth Circuit decision, *Iglesia Pentecostal Casa De Dios Para Las Naciones, Inc. v. Duke*, 718 F. App'x 646 (10th Cir. 2017), forecloses Plaintiffs' challenge here. ECF No. 19-1 at 29–30. Of course, that decision does not bind this Court. But even so, it is distinguishable. In that case, the plaintiff church had proposed compensating a religious worker through "love offerings" or charitable donations, from its congregation. *Id.* at 649. The amounts were not reflected in the church's financial documents, it explained, because the money collected thus far had gone directly from the parishioners to the worker. *Id.* The AAO denied the visa petition because the church could not provide any documentation about the love offerings and because its other documents appeared unreliable. *Id.* The church argued that the compensation regulation effectively prevented compensating a religious worker through charitable contributions. *Id.* at 651–52. To the contrary, the Tenth Circuit found that the regulation did not restrict the church from funding the worker's salary though "love offerings"—or any other method of compensation—but merely required documentation of the contributions, which the church could not provide because it had not kept track of them. *Id.* at 652. Thus, the church could not prove that it used the contributions in the past to compensate the worker, nor could it show that they would be enough, going forward, to pay his salary.

In contrast, the AAO's decision here did not turn on a failure by NCP or Mizo to document how they paid for Rev. Engzau's health care or utility costs. Given how NCP chose to structure the compensation, the specific types of proof the AAO required did not—and *could not*—have existed. And unlike in that case, the parties agree that NCP provided evidence that it

and Mizo had more than enough funds to pay Rev. Engzau a $32,000 salary for the next year.

For these reasons, in this case, the AAO's decision crossed the line into substantially burdening

NCP's free exercise right to decide how to compensate Rev. Engzau.

Once a plaintiff establishes a substantial burden, the government must show it has a

compelling interest justifying that action and that the action is the least restrictive means of

furthering that interest.  *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 726–28 (2014).

Tellingly, Defendants make no argument that denying NCP's petition under these circumstances

serves a compelling interest.  Thus, they have conceded that argument, and they cannot meet

their burden for that reason alone.  *See Sykes v. Dudas*, 573 F. Supp. 2d 191, 202 (D.D.C. 2008)

("In this district, when a party responds to some but not all arguments raised on a Motion for

Summary Judgment, a court may fairly view the unacknowledged arguments as conceded."); *see*

*also Sabra*, 453 F. Supp. 3d at 331 (denying summary judgment motion because government did

not argue a compelling interest under RFRA).  In any event, as explained below, Defendants'

interest in enforcing the compensation regulation the way the AAO did here is all but non-

existent.

Plaintiffs note that Defendants promulgated the compensation regulation to improve its

"ability to detect and deter fraud and other abuses in the religious worker program."  73 Fed.

Reg. 72,276 (Nov. 26, 2008).  And the preamble to the religious worker regulations justified the

rules by citing a Government Accountability Office report that highlighted problems with

fraudulent applications:

> The report stated that the fraud often involved false statements by
> petitioners about the length of time that the applicants were
> members of the religious organizations, the petitioners' qualifying
> work experience and the positions being filled. The report also
> noted problems with applicants making false statements about their
> qualifications and exact plans in the United States. In 2005,

> USCIS's Office of Fraud Detection and National Security (FDNS) estimated that approximately one-third of applications and petitions filed for religious worker admission were fraudulent. FDNS found that a significant number of the fraudulent petitions identified had been filed on behalf of non-existent organizations. FDNS also found a significant number of petitions that contained material misrepresentations in the documentation submitted to establish eligibility.

73 Fed. Reg. at 72,277.

No doubt, the government's interest in preventing fraud is generally a compelling government interest. *See Duke*, 286 F. Supp. 3d at 1265 ("[P]reventing immigration fraud is likely a compelling state interest" under RFRA); *see also Bowen v. Roy*, 476 U.S. 693, 709 (1986) (preventing social security benefit fraud is "a legitimate and important public interest"); *Bowen*, 476 U.S. at 726 (O'Connor, J., concurring) ("[P]reventing fraud and abuse . . . is both laudable and compelling."). But RFRA requires a court to look beyond a generalized interest and "'scrutiniz[e] the asserted harm of granting specific exemptions to particular religious claimants'—in other words, to look to [Defendants'] marginal interest in enforcing" the compensation regulation the way they have in this case. *Hobby Lobby*, 573 U.S. at 726–27 (quoting *Gonzales*, 546 U.S. at 431). No compelling interest exists here. Defendants do not argue that NCP does not exist, or that there is any fraud afoot here. Given the interest the compensation regulation serves, and that Defendants do not allege fraud, they cannot show a compelling interest in denying NCP's petition for the reasons asserted.[12] *See Duke*, 286 F. Supp. 3d at 1265 (finding plaintiffs had substantial likelihood of success on RFRA claim related to R-1 visa denial "where there [were] no allegations of fraud").

---

[12] The AAO decision "note[d] that [NCP] did not file an amended Form I-129 in 2016 to reflect the [changes] to [Rev. Engzau's] compensation." ECF No. 1-2 at 5 n.1. As Plaintiffs point out, the regulations do not require a religious organization to give USCIS notice of a change of their internal compensation structure. ECF No. 24 at 6. And Defendants cite no requirement either.

### 3.    Remedy

The Court will remand this matter to USCIS for further proceedings consistent with this opinion.  *See* 42 U.S.C. § 2000bb-1(c) (authorizing "appropriate relief against a government"). The Court declines to order USCIS to approve NCP's petition because the AAO may still determine that denial is appropriate, either on the third-party compensation issue not before the Court or on "new grounds of ineligibility not addressed in the initial decision."  USCIS, *AAO Practice Manual* § 3.14(b), available at https://www.uscis.gov/administrative-appeals/aao-practice-manual/chapter-3-appeals (last updated Aug. 27, 2021).  For the same reasons, the Court finds declaratory relief unnecessary since it has already held that Defendants violated RFRA by applying it to deny NCP's visa petition.  *See Winpisinger v. Watson*, 628 F.2d 133, 141 (D.C. Cir. 1980) ("It is axiomatic that the request for declaratory relief is discretionary with the court, and that the request should be denied where 'it will not . . . serve a useful purpose.'") (citation omitted).

### B.    APA

The Court will grant Defendants' summary judgment motion as to Plaintiffs' APA claim. The APA creates a cause of action to challenge "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704. When determining whether an alternative "adequate remedy exists, [courts focus] on whether a statute provides an independent cause of action or an alternative review procedure."  *El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. U.S. Dep't of Health & Hum. Servs.*, 396 F.3d 1265, 1270 (D.C. Cir. 2005).  For example, "relief will be deemed adequate 'where a statute affords an opportunity for *de novo* district-court review' of the agency action."  *Garcia v. Vilsack*, 563 F.3d 519, 522–23 (D.C. Cir. 2009) (quoting *El Rio Santa Cruz*, 396 F.3d at 1270). The "alternative remedy need not provide relief identical to relief under the APA, so long as it

offers relief of the 'same genre.'" *Garcia*, 563 F.3d at 522; s*ee also Env't. Def. Fund v. Reilly*, 909 F.2d 1497, 1506 (D.C. Cir. 1990) (providing adequate remedy where alternative statute granted de novo review, more lenient standard of review, and provided court greater latitude in fashioning remedies).

Plaintiffs do not have a cause of action under the APA because RFRA provides an adequate remedy.  RFRA provides an independent cause of action that allows for "appropriate relief against a government."  42 U.S.C § 2000bb–1(c).  The Supreme Court has instructed that because this language is so "open-ended," relief under RFRA is flexible enough to be "inherently context dependent."  *Tanzin v. Tanvir*, 141 S. Ct. 486, 491 (2020) (quoting *Sossamon v. Texas*, 563 U.S. 277, 286 (2011)).  For example, when remedying a regulatory RFRA violation, a court can even instruct an agency to eliminate the violation through "what [the agency] regard[s] as the best solution."  *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2395 (2020) (Alito, J., concurring) (citing *Hobby Lobby*, 573 U.S. at 736).  Moreover, as other courts have recognized, RFRA review is not limited to an administrative record and is not subject to the APA's deferential standard of review, *see Duke*, 286 F. Supp. 3d at 1262, which suggest that it provides an alternative adequate remedy to the APA.  For all these reasons, Plaintiffs lack a cause of action under the APA, and thus summary judgment is warranted in Defendants' favor on these claims.  *See S.T. ex rel. Trivedi v. Napolitano*, Civ. No. H–12–285, 2021 WL 6048222, at *4 (S.D. Tex. Dec. 5, 2012) (precluding APA review  because plaintiff's "claimed violation of his right to freely exercise his religion is adequately addressed through his RFRA claims"); *S. Fork Band Council of W. Shoshone v. U.S. Dep't of the Interior*, No. 3:08–616, 2009 WL 73257, at *1 (D. Nev. Jan. 7, 2009) ("In including a citizen-suit provision that

enables a plaintiff to obtain 'appropriate relief,' the RFRA provides an adequate alternative remedy to review under the APA.").

### C.   Mandamus

The Court will also grant Defendants' summary judgment motion as to Plaintiffs' mandamus request. Mandamus is a "drastic" remedy. *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016). "To show entitlement to mandamus, plaintiffs must demonstrate (1) a clear and indisputable right to relief, (2) that the government agency or official is violating a clear duty to act, and (3) that no adequate alternative remedy exists." *Id.* (citations omitted). "These three threshold requirements are jurisdictional; unless all are met, a court must dismiss the case for lack of jurisdiction." *Id.* For all the reasons already explained, RFRA provides an adequate remedy for Plaintiffs, and thus this claim must be dismissed. Finally, the Court notes that Plaintiffs ask it to enter a mandamus order directing USCIS to grant NCP's renewal petition. ECF No. 20-1 at 33. But Plaintiffs have not shown a "clear and indisputable right" to that relief, given that, as also discussed above, the AAO could still deny the petition on grounds unrelated to the issues addressed in this opinion. *Am. Hosp. Ass'n*, 812 F.3d at 189.

## IV.   Conclusion

For the above reasons, Defendants' Motion for Summary Judgment, ECF No. 19, will be granted in part and denied in part, and Plaintiffs' Cross-Motion for Summary Judgment, ECF No. 20, will be granted in part and denied in part. The Court will remand this matter to USCIS for further proceedings consistent with this opinion. A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: October 19, 2021